**Dudley R. TABB and Edna T. Tabb,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 725.**

United States District Court
M. D. Georgia,
Thomasville Division.

Aug. 10, 1965.

Randolph A. Jones and A. Wallace Cato, Bainbridge, Ga., for plaintiffs.

Floyd M. Buford, U. S. Atty., and Sampson M. Culpepper, Asst. U. S. Atty., Macon, Ga., Hubert M. Crean and John F. Betar, Trial Attys., Dept. of Justice, and G. Hunter Gibbons, Office of Judge Advocate General, Dept. of the Air Force, Washington, D. C., for defendant.

ELLIOTT, District Judge:

This action is one brought under the Federal Tort Claims Act, §§ 2671–2680, of Title 28, United States Code. This Court has jurisdiction under § 1346(b), Title 28, United States Code. By this action Plaintiffs, Dudley R. and Edna T. Tabb, seek to recover property damages claimed to have been sustained when an aircraft owned and operated by the United States created a "sonic boom" causing damage to a building jointly owned by them and located near Lake Seminole, in Decatur County, Georgia. The Defendant contends: (1) that no Government aircraft were operated in such manner as to cause a sonic boom in the vicinity of Plaintiffs' property at the times claimed, (2) that if any such sonic boom was created by the operation of Government aircraft in the vicinity such sonic boom was not the proximate cause of the property damage alleged, and (3) that if Government aircraft did cause such a sonic boom and if such sonic boom did cause damage to the Plaintiffs' property, the claim is barred by the discretionary function exception in the Tort Claims Act (28 U.S.C. § 2680(a)). The case was tried before the Court without a jury and submitted by counsel for the respective parties on all issues of fact and law. This opinion is intended as compliance by the Court with the requirements of Rule 52, Federal Rules of Civil Procedure.

"Sonic speed" is the speed of sound. The speed of sound varies somewhat depending on altitude and atmospheric conditions, but it is approximately 750 miles per hour. An aircraft which travels in the air at a speed less than the speed of sound is operated at a "subsonic" speed. An aircraft which is traveling in the air at a speed greater than the speed of sound is operating at a "supersonic" speed.

For some time prior to October, 1963 aircraft of the United States Air Force and the United States Navy operated in the area of which Lake Seminole is a part. Some of these aircraft were subsonic and some were supersonic. On October 10, 1963, at sometime around midday, a United States B–58 Air Force bomber operated by Air Force personnel flew over

the area where the Plaintiffs' property is located. The plane was flying at a supersonic speed at an altitude of about 35,000 feet, thereby creating what is known as a "sonic boom".

As an aircraft moves through the air subsonically it generates noises which principally come from its engines. As the aircraft approaches sonic speed the noise begins to travel at the same speed as that at which the noise is generated. When the aircraft goes beyond the speed of sound there is a "pile-up" of these sound waves and these waves spread in all directions from the aircraft, and if these sound waves are strong enough to reach the ground a listener on the ground will hear a "boom". The boom is first created at the point where the aircraft exceeds the speed of sound and at that point the wave is relatively flat (at right angles) with the nose of the plane, but it then continually follows the aircraft as long as it flies at the supersonic speed and after the speed of sound is passed the waves come off from the front of the aircraft in a conical direction. Thus it may be said that an aircraft flying at a supersonic speed "drags a cone of sound" along its path. The sonic boom is in reality a shock wave which is created by the build-up of the sound waves. The strength of a sonic boom which reaches the ground will vary depending on the aircraft's altitude, its size, its weight and its speed, also the temperature of the air, the movement of the wind, the amount of moisture in the air, and the general terrain will affect the boom's strength.

The pressure exerted by the sonic boom shock wave is called "over-pressure" and is measured in pounds per-square-foot of area, in much the same way that the pressure exerted by a ground wind is measured in pounds of pressure per-square-foot. The over-pressure created by a sonic boom generated by a B–58 Air Force bomber flying at its maximum speed at an altitude of 35,000 feet in normal weather conditions would be between 5 and 7 pounds per-square-foot. By comparison, a ground wind of 30 miles per hour creates a pressure of about 5 pounds per-square-foot, although the over-pressure created by the ground wind is of a somewhat different character than that created by a sonic boom. In the case of a ground wind there is a steady flow of wind and a steady pressure in one direction and this creates a dynamic situation where the air actually moves and causes pressure in a certain direction, whereas, in the case of a sonic boom the over-pressure referred to is not a pressure that pushes on a structure in the manner in which a wind would push upon it, but the structure is being subjected to a "squeezing" effect, the pressure being suddenly increased from all directions, front, back, side and top.

The Plaintiffs own a one-story concrete block storehouse in Decatur County near Lake Seminole, which building is used by them as the site for the operation of a restaurant known as the Spring Creek Cafe. The building is 30 feet wide and 60 feet long, concrete floor, asphalt shingle roof, sheet rock ceiling, with concrete block walls set on poured reinforced concrete foundations in soil sometimes called red clay and sometimes called red sand, and having glass windows set in aluminum frames, some of the windows being as large as 4 feet by 5 feet, and others being smaller. The concrete block walls are plastered on the inside and have been given some treatment similar to plaster on the outside. The building was constructed in January and February, 1959 and was occupied by the Tabbs for business purposes on March 1, 1959. The building was not built according to any architectural plans or specifications, the plans having been prepared by the owner and the original cost of construction was about $12,500.00. This building was being used by the Plaintiffs for the business purpose indicated on October 10, 1963.

At the time the sonic boom was created by the Air Force bomber on October 10, 1963 Mrs. Tabb was engaged in cleaning the floors in a part of the

restaurant. She was startled by the noise of the boom and noticed that the vibration caused a small piece of plaster to fall to the floor from a crack in the wall. Prompted by this occurrence she and Mr. Tabb subsequently made an inspection of the premises and observed a large number of cracks in the structure. These cracks located throughout the building were of various sizes and shapes. Some were hairline cracks and others were so pronounced that daylight was visible through the wall and some were of such size that a man's finger could be inserted in the opening. Believing these cracks to have been caused by the sonic boom on that and previous dates, plaintiffs made a complaint to the appropriate Air Force command and within a few days an inspection was made of the premises by Air Force personnel. At the time of this inspection the Plaintiffs pointed out the damage claimed to have been caused by the sonic boom and an Air Force representative made a series of about 25 photographs of the various cracked areas, which photographs were introduced in evidence at the time of trial of this matter. It was not claimed by the Plaintiffs that there was any damage to any of the glass windows in the structure and no glass damage was observed by any person who inspected the premises. No glass was shattered, none was cracked. No examination was made of the foundation of the building and the Court is without such information as might have been developed if such an examination had been made.

It is recognized in the construction industry that concrete block structures are peculiarly susceptible to cracking. This can result from some movement in the foundation, from expansion and contraction caused by extremes in temperature, by an improper combination or use of materials, or by combinations of various circumstances. But whatever the cause, practically all concrete block structures do develop cracks of varying degree. The question which we must resolve here is whether these cracks in this building were caused by sonic boom action.

We remind ourselves that in a civil action such as this the burden is upon the Plaintiffs to prove by a preponderance of the evidence all the essential elements of the Plaintiffs' case. Specifically, this means that the evidence must preponderate in favor of the contention of the Plaintiff that the sonic boom complained of was the proximate cause of the cracks in the building. We have no eye witness testimony—no one saw the cracks appear. Plaintiffs say they had not observed the cracks before the boom, but that they did afterward. On the other hand, a number of the photographs which were made of the cracks indicate rather conclusively that some of them had been in existence for quite a length of time. In fact, some appear to have been at one time patched up and some others appear to have been painted over. We are also impressed by the remarkable circumstance that there is no glass damage of any nature. Of all of the elements going to make up the structure the glass in the building would be the weakest part and the most susceptible to damage by a shock such as that created by a sonic boom, and it would be reasonable to expect that if any part of the building was damaged by the boom there would be glass damage. Coupled with this fact is the further fact that there was no glass damage to any other building in this immediate area. It is difficult for us to conceive how it would be possible for a shock wave exerting a "squeezing" effect on a building to exert such pressure as to produce cracks of excessive size in concrete walls and not at the same time with that same pressure shatter, or at least crack, some, if not all of the glass windows in the structure.

There were four expert witnesses who testified, each of whom had made an examination of these premises for determination of possible cause of the condi-

**190**

tion of this building. Some one or more of them testified that the damage was caused by a settling or shifting of the foundation. Some one or more of them testified that the condition did not result from a settling or shifting of the foundation. Some one or more of them testified that the damage was caused by faulty materials or improper construction. Some one or more of them testified that the cracks did not result from faulty materials or improper construction. Some one or more of them testified that the damage was caused by improper allowance for expansion and contraction. Some one or more of them testified that the damage was not caused by improper allowance for expansion and contraction. But *none of them*—neither witnesses for the Plaintiffs nor for the Defendant—testified that in their opinion the damage was the result of a sonic boom. And two of them—witnesses for the Defendant—testified that a sonic boom could not have caused the damage observed in this structure, giving valid reasons to support their opinions.

When the physical facts are analyzed and the expert evidence considered and the probabilities weighed, we are led to the conclusion that the Plaintiffs' case has not been established by a preponderance of the evidence. This is not to say that there is any doubt that Mr. and Mrs. Tabb sincerely believed that the cracks in their building were caused by the sonic boom, nor is it to imply that Counsel for the Plaintiffs have not in complete good faith prosecuted their clients' claim. It is simply to say that the Court is not persuaded by the evidence that the sonic boom was the proximate cause of the damage, and consequently the Plaintiffs are not entitled to be awarded damages in any amount.

We do not reach the question whether such a claim would otherwise have been barred by the discretionary function exception in the Tort Claims Act.

Judgment will be entered for the Defendant pursuant to the foregoing opinion.